**Julia Floridalma RIOS, Paulo Jordan Rios, Petitioners,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 01–70836.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 5, 2002.

Filed May 1, 2002.

Colin T. Greene, Hanlon & Greene, Pasadena, CA, for the petitioners.

Heather R. Phillips (argued) and Paul Fiorino (brief), attorneys, Office of Immigration, Department of Justice, Washington, DC, for the respondent.

Before: PREGERSON, TROTT, and GOODWIN, Circuit Judges.

PREGERSON, Circuit Judge.

Julia Floridalma Rios ("Rios") and her son, Paulo Andre Jordan–Rios ("Paulo"), Guatemalan natives and citizens, fled Guatemala for the United States and sought asylum and withholding of deportation because they were persecuted on account of their imputed political opinion. In the alternative, they sought voluntary departure. Following a deportation hearing, an Immigration Judge denied petitioners' requests for asylum and withholding of deportation, but granted their request for voluntary departure. Rios and Paulo ap-

pealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA adopted the IJ's reasoning and dismissed petitioners' appeal. Petitioners now seek review of the BIA's dismissal of their appeal. We have jurisdiction pursuant to 8 U.S.C. § 1252(b), and, for the reasons that follow, we grant Rios' and Paulo's petitions, vacate the BIA order, and remand for further proceedings.

## I. Facts[1] and Procedural History

■ Before petitioners fled Guatemala for the United States in September 1991, they lived in Guatemala City with Hector Hugo Cordon ("Hector")—Rios' husband and Paulo's father. Hector was a colonel in the Guatemalan army. As the IJ observed, Hector "was apparently causing significant interdiction to the guerrilla activities as a result of his position and as a result of his competency in the execution of those duties." Rios' brother, Ricardo Rios ("Ricardo") was also a member of the Guatemalan military.

On June 15, 1990, guerrillas kidnaped Rios as she was walking home from work. Two guerrillas directed her, at knife point, into the back seat of a car with darkened windows. One man sat in the back seat with Rios, one man sat in the front seat, and a third man drove. The man in the back seat tied Rios' hands with tape and blindfolded her. Rios described her conversation with the guerrillas:

> [One of the men] said that my husband and my brother have killed many of their people and that they were going to take revenge for that. I told him that they were no criminals. When I said that the man who was sitting next to me grabbed my hand and cut it with the

knife that he had. He said that was going to be just the beginning and that I was going to take a message from them. . . . I then told him why he did that for. I had nothing to do with what they said my husband and my brother were doing. He just answered by saying that "this is nothing compared to what your husband and brother had done to us and to our people."

Rios was detained by the guerrillas for three days. While Rios was detained she received warm compresses and first aid attention for her hand. Unexpectedly, the guerrillas released her; they drove her to a remote spot and left her by the side of the road. After Rios found her way home, she was taken to a military hospital. Because the guerrilla had severed tendons in Rios' hand, Rios stayed at the military hospital for about a month.

After Rios was released from the hospital, she began receiving threatening telephone calls about three times a month. Anonymous callers told her "to take care because [her family] were going to be killed."

Guerrillas tried to kidnap Paulo in early 1991, when Paulo was about thirteen years old. Paulo was a block away from the military school he attended when a man approached him and "asked him if [he] knew Hector Jordan [sic]." Paulo responded that Hector was his father. The man then grabbed Paulo by the arm and started pulling him. Paulo screamed and pushed the man away. Soldiers guarding the entrance of the military school came running and rescued Paulo. Paulo did not return to the military school—he went to his mother's office every day for a few

---

1. The facts described below are taken from Rios' and Paulo's testimony at their deportation hearing. Because the IJ found petitioners to be credible, and the BIA did not question petitioners' credibility, we presume their testimony to be true. *See Ventura v. INS*, 264 F.3d 1150, 1154 (9th Cir.2001).

months, and then attended a private school for the remainder of the school year.

On August 12, 1991, guerrillas abducted and killed Hector. A neighbor told Rios that three men had forced Hector into a car and shot him. Later that day, Rios found Hector's car: "[a]ll the windows were broken, the car had been shot, there was blood, glass all over the floor." Hector's body was never found.

After Hector was killed, Rios and Paulo began living at the military base in Guatemala City. Rios and Paulo were unable to leave the military base, and had military escorts at all times. Rios decided that she and Paulo had to leave Guatemala because their lives were in danger. Rios got tourist visas from the United States Consulate in Guatemala City, and she and Paulo flew to the United States on September 15, 1991. Rios' brother, Ricardo, informed Rios that guerrillas tried to break into her home two days after petitioners left Guatemala.

After three years in the United States, petitioners applied for asylum. While their applications were pending, on November 1, 1996, Ricardo (Rios' brother) was killed when a bomb exploded on an airplane he was piloting. At the time, Ricardo had retired from the army, and was a commercial pilot. Rios' sister told Rios that the guerrillas were responsible for the bombing.

On April 24, 1998, the INS charged petitioners with being removable under INA § 237(a)(1)(B). In a deportation hearing before Immigration Judge Gilbert Gembacz ("IJ"), petitioners conceded removability but sought asylum, withholding of deportation, and, in the alternative, voluntary departure. On June 22, 1999, the IJ denied petitioners' request for asylum and withholding of deportation, but granted their request for voluntary departure. The IJ found that "[t]he respondents were

clearly subject to specific individualized attention by the guerrillas," and found that petitioners "were subjected to this kind of treatment because of the fact that the husband and father was a soldier of high rank in the Army of Guatemala, who was apparently causing significant interdiction to the guerrilla activities." However, the IJ concluded, without citation, that "sufficient precedent . . . states that this is not a protected belief or immutable trait." The IJ also found that the conditions in Guatemala had changed because "a peace accord . . . was signed by the Guatemalan National Revolutionary Unity Guerrillas in 1996," and because "many of the guerrilla forces are now disarmed and members of a recognized legal political party, which is actively playing a part in the government of their country as a result of these peace accords."

The BIA affirmed the IJ's decision "based on and for the reasons set forth in [the IJ's] decision."

## II. Analysis

### A. Standard of Review

 Because the BIA adopted the IJ's reasoning, we review the IJ's determination that petitioners failed to demonstrate past persecution or a well-founded fear of future persecution under the "substantial evidence" standard. *Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1239 (9th Cir.1997). Reversal is warranted only if the evidence presented by petitioners "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

### B. Asylum

Rios and Paulo are eligible for a discretionary grant of asylum from the Attorney

General if they are "refugees," as defined by section 101(a)(42)(A) of the Immigration Nationality Act ("INA"), 8 U.S.C. § 1101(a)(42)(A). *See Ernesto Navas v. INS*, 217 F.3d 646, 654 (9th Cir.2000). A "refugee" is defined as an individual unable or unwilling to return to her home country because of persecution or "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution. *See id.* The INS can rebut this presumption by showing, by a preponderance of the evidence, that the conditions in the applicant's home country have changed such that she no longer has a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1)(i) (1999).

### 1. Persecution

 Persecution is " 'the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive.' " *Surita v. INS*, 95 F.3d 814, 819 (9th Cir.1996) (quoting *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir.1995)). It is clear from the record that petitioners were persecuted by the guerrillas. The fact that anonymous callers repeatedly threatened to kill petitioners' family is sufficient basis to find persecution. *See Ernesto Navas*, 217 F.3d at 658 (stating "death threats alone can constitute persecution"). The fact that guerrillas wounded Rios so severely that she was hospitalized for a month is also sufficient basis to find persecution. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1161 (9th Cir.1999) (finding persecution where "the petitioner was physically harmed because of his ... political opinion"). In this case, petitioners have suffered significantly more: guerrillas kidnaped Rios, attempted to kidnap Paulo, and murdered Rios' hus-

band and her brother. Accordingly, petitioners have demonstrated that they suffered past persecution.

### 2. "On account of" Political Opinion

 In order to establish that they were persecuted "on account of" political opinion, petitioners must show "that [they] held (or that [their] persecutors believed that[they] held) a political opinion," and that "[their] persecutors persecuted [them] *because of* [their] political opinion." *Ernesto Navas*, 217 F.3d at 656 (citations omitted); *see also Elias–Zacarias*, 502 U.S. at 482, 112 S.Ct. 812. Petitioners must provide some direct or circumstantial evidence that they were persecuted on account of political opinion, although we "ha[ve] held persecution to be on account of political opinion where there appears to be no other logical reason for the persecution at issue." *Ernesto Navas*, 217 F.3d at 657 (citations omitted).

 The INS argued, and the IJ concluded, that Hector's and Ricardo's involvement in the Guatemalan Army and interdiction of guerrilla activities could not be construed as a "political opinion." However, we have found that persecution on account of anti-guerrilla sympathies, statements, and activities, amounts to persecution on account of political opinion. In a similar case, *Meza–Manay v. INS*, 139 F.3d 759, 764 (9th Cir.1998), we found that the Shining Path, a Peruvian terrorist group, persecuted the petitioner ("Meza–Manay") because they imputed to her the political opinions of her husband, Issac Manay ("Isaac"), who was "involve[d] with the Peruvian Police Force's counter-insurgency movement." In that case, a car bomb exploded outside the house where Meza–Manay and Isaac lived and, a few hours later, an anonymous caller threatened their lives. In subsequent months

and years, members of the Shining Path shot at Isaac and Meza–Manay, attempted to kidnap Meza–Manay's children, bombed Isaac's parents' home, and abducted and killed Isaac's brother. After reviewing these facts, we concluded that, "even if Meza–Manay held no personal political beliefs against the Shining Path," she was still eligible for asylum because the Shining Path persecuted her based on her imputed political opinion. *Id.* at 764. We have also found persecution on account of political opinion in other cases in which petitioners or their relatives held pro-military, anti-guerrilla views. *See, e.g., Ventura,* 264 F.3d at 1154(finding persecution on account of political opinion where guerrillas sent petitioner threatening letters "because they believed he held anti-guerrilla sympathies" and attacked and killed his relatives "because of their military affiliations"); *Del Carmen Molina v. INS,* 170 F.3d 1247, 1249 (9th Cir.1999) (finding persecution on account of political opinion where guerrillas sent threatening notes to petitioner and killed relatives with military affiliations because the petitioner held pro-military, anti-guerrilla views and her family was closely associated with the military).

"Where police beat and threaten the spouse of a known dissident, it is logical, in the absence of evidence pointing to another motive, to conclude that they did so because of the spouse's presumed guilt by association. In the eyes of those who persecute the spouse of a political activist, the activist's political sins are, by derivation, the spouse's." *Ernesto Navas,* 217 F.3d at 659 n. 18 (citations omitted). In this case, as in *Meza–Manay, Ventura,* and *Del Carmen Molina,* the threats and attacks on Rios and Paulo compel the conclusion that petitioners were "perceived to be . . . political opponent[s]" by the guerrillas, and were the intended "targets" of the guerrillas' violent acts. *Meza–Manay,* 139 F.3d at 764. Indeed, guerrillas actually *told*

Rios that they abducted and wounded her because her husband and brother were members of the Guatemalan army, and confirmed that Hector was Paulo's father before attempting to abduct Paulo. Under the circumstances of this case, no reasonable factfinder could fail to find that the guerillas imputed Hector's and Ricardo's political opinions to Rios and Paulo, and persecuted them on account of those imputed political opinions.

### 3. Changed Country Conditions

 A finding of past persecution raises the presumption that an asylum-seeker has a well-founded fear of future persecution, rebuttable by a showing, by a preponderance of the evidence, that conditions have changed sufficiently so as to overcome that presumption. *See* 8 C.F.R. § 208.13(b)(1)(i) (1999); *Ernesto Navas,* 217 F.3d at 657. The INS is obligated to "introduce evidence that, on an individualized basis, rebuts a particular applicant's specific grounds for his well-founded fear of future persecution." *Ernesto Navas,* 217 F.3d at 662. "Information about general changes in the country is not sufficient." *Garrovillas v. INS,* 156 F.3d 1010, 1017(9th Cir.1998). If the INS has not met its burden of production, it is unnecessary to remand this case to the BIA for further findings on this issue. *Ernesto Navas,* 217 F.3d at 662. We conclude that the INS has not met its burden of production in this case, and therefore find that it is unnecessary to remand this case to the BIA.

The INS submitted the 1998 United States Department of State Report on Human Rights Practices in Guatemala ("1998 Country Report") as the sole evidence of Guatemala's changed conditions. Based on the 1998 Country Report, the IJ concluded that conditions in Guatemala had changed because "a peace accord . . . was

signed by the Guatemalan National Revolutionary Unity Guerrillas in 1996," and "many of the guerrilla forces are now disarmed and members of a recognized legal political party, which is actively playing a part in the government of their country as a result of these peace accords."

Neither of these observations constitutes "evidence that, on an individualized basis, rebuts [petitioners'] specific grounds for [their] well-founded fear of future persecution." *Ernesto Navas*, 217 F.3d at 662. The IJ merely speculated that guerrillas will not persecute petitioners if they return because a peace accord was signed and guerrillas have become members of a legal political party. Contrary to the IJ's conclusion that conditions in Guatemala have changed, the record reflects that Ricardo was murdered by guerrillas the same year that the peace accord was signed, and Rios declared that guerrillas continue to exist in Patin, where her husband Hector headed the military command. Moreover, the 1998 Country Report that was produced as evidence of changed country conditions by the INS reported that "[l]ynchings, mob attacks, and unsolved killings continued, and the Government frequently was unable to prosecute the perpetrators."

In another case, we found that the country conditions in Guatemala had not changed enough by 1997 to rebut a presumption of future persecution by guerrillas because there was evidence that "guerrillas continue to subject civilians to death threats." *Ventura*, 264 F.3d at 1157. In light of the 1998 Country Report and our finding in *Ventura*, we conclude that the INS did not meet its burden of introducing evidence that rebuts, on an individualized basis, petitioners' well-founded fear of future persecution based upon their past persecution.

The INS argues that petitioners do not face a threat of future persecution because Rios' sister and parents continue to live in Guatemala. However, Rios' family's continued presence in Guatemala does not rebut petitioners' well-founded fear of future persecution for two reasons. First, although Rios testified at the hearing that her sister and parents continue to live in Guatemala, she was not asked and did not testify about whether her family members have ever been persecuted by the guerrillas. Second, even assuming that Rios' family is safe, this fact, while relevant, is insufficient to rebut the presumption that petitioners have a well-founded fear of future persecution. We have found that a petitioner's family's continued safety does not rebut the petitioner's well-founded fear of future persecution when there is no evidence that the family is "similarly situated or subject to similar risk, and nothing in the record supports an inference that their safety ensures that [petitioner] will be safe." *Lim v. INS*, 224 F.3d 929, 935 (9th Cir.2000). Because Rios' sister and parents are not related to Hector and there is no evidence that Rios' sister and parents were assaulted or threatened in the past, there is no reason to conclude that they are similarly situated to petitioners or that Rios' family's safety ensures that petitioners would be safe if they returned to Guatemala.

In sum, petitioners' credible and undisputed testimony compels the conclusion that they were persecuted on account of their imputed political opinion. Having demonstrated past persecution, petitioners are presumed to have a well-founded fear of future persecution. As the INS has not sufficiently rebutted this fear of future persecution, the petitioners are entitled to asylum.

## C. Withholding of Deportation

Petitioners are also entitled to withholding of deportation to Guatemala.

"A determination of past persecution such that a petitioner's life or freedom was threatened creates a presumption of entitlement to withholding of deportation." *Ventura,* 264 F.3d at 1154 (citing *Duarte de Guinac,* 179 F.3d at 1164). "The INS may rebut that presumption by showing by a preponderance of the evidence that persecution is no longer more likely than not due to changed country conditions." *Id.*

Rios and Paulo are entitled to a presumption of entitlement to withholding of deportation because their lives and freedoms were threatened in Guatemala: guerrillas kidnaped Rios and cut her hand so severely that she remained in the hospital for a month, attempted to kidnap Paulo, regularly threatened to kill Rios' family, and killed Rios' husband and brother. The INS failed to rebut that presumption by showing by a preponderance of the evidence that petitioners' future persecution is no longer more likely than not due to changed country conditions.

## CONCLUSION

For the foregoing reasons, Rios' and Paulo's petition is granted. We find that petitioners presented compelling evidence of past persecution on account of imputed political opinion that mandates a presumption of future persecution, and we find that the INS has failed to rebut this presumption. We also find that petitioners are entitled to withholding of deportation because they have established that their lives and freedom were threatened in Guatemala, and the INS failed to rebut the presumption of future persecution.

PETITION FOR REVIEW is GRANTED. WITHHOLDING OF DEPORTATION to Guatemala is GRANTED. Petitioners' application for asylum is REMANDED for the exercise of the Attorney General's discretion.